COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



DAVID J. QUICK,


 Appellant,


v.


PLASTIC SOLUTIONS OF TEXAS,
INC., A TEXAS CORPORATION;
PLASTIC SOLUTIONS MOLDING,
INC., A TEXAS CORPORATION; KURT
H. RUPPMAN, SR., INDIVIDUALLY,
and FAIRFIELD ENTERPRISES, INC.


 Appellees.
§


 


§


 


§


 


§


 


§


 


 § 


§


§


§

No. 08-06-00153-CV



Appeal from the


380th District Court 


of Collin County, Texas 


(TC#380-2143-04)





O P I N I O N


 Appellant, David J. Quick, appeals a take-nothing judgment on various contract claims he
brought against Appellees, Plastic Solutions of Texas, Inc. ("PST"), Plastic Solutions Molding, Inc.
("PSMI"), Kurt H. Ruppman, Sr. (collectively, the "PST Defendants"), and Fairfield Enterprises, Inc.
("Fairfield"). We affirm the judgment of the trial court.

I. BACKGROUND

 Quick is a certified public accountant. In 1994, he started his own accounting practice. 
Shortly thereafter, Quick met Appellee Kurt Ruppman, Sr. who, at the time, was serving as president
of Piper Plastics. Ruppman left Piper Plastics in late 1994 and started PST. Ruppman began
experimenting with the use of very cold temperatures in the manufacture of hot-fill PET
(Polyethylene Terephthalate) plastic bottles. He developed a process by which preform plastic
bottles were heated, stretched with a stretch rod, injected with liquid nitrogen at high pressure, and
molded. Ruppman referred to the process as "cryogenic," because of the cold temperatures involved,
due to the presence of liquid nitrogen. Ruppman applied for and received a patent for his process.

 During this time, Quick did some work for Ruppman by preparing projections and forecasts
for potential business pursuits. Ruppman informed Quick that he was not able to pay him for such
services, but suggested that he might work for an interest in the company. Quick was impressed with
Ruppman's knack for ideas and saw a potential financial gain in working for an interest in his
business. In February or March of 1995, Quick and Ruppman discussed an agreement, which Quick
had prepared, that would grant him a royalty interest in PST. The two discussed various terms, but
never executed the agreement. Nevertheless, Quick believed that he had an oral agreement for 5
percent of the gross margin of Ruppman's business. In return, according to Quick, he was to provide
various services to PST.

 Beginning in late 1995, Ruppman entered into a series of agreements with the Ball
Corporation ("Ball"), in which Ball acquired exclusive licensing rights to Ruppman's patented
process. Under the agreements (collectively, the "Ball Agreements"), Ball paid a total of $1.5
million to PST during 1995 and 1996. PST was obligated to use its best efforts to develop a
commercially viable process for manufacturing bottles using the cryogenic technology. If PST could
do so, Ball was obligated to commit to firm orders for production machinery or market sub-licenses
of the patented technology. Ball and PST were to split any sub-licensing revenue. During the
following months, Ruppman attempted to develop such a commercially viable process to
manufacture PET bottles, using the cryogenic technology.

 Ball is well-known in the container industry. Due to its participation with Ball, many people
in the plastics industry were interested in PST's cryogenic technology. PST had very high
expectations for the relationship with Ball and believed that Ball, which had become the exclusive
sub-licensor of the technology, would be successful in licensing it. Ball, in turn, appeared to believe
that the licensing would be successful, and it represented to PST that it was a good technology.

 Sometime in late 1996 or early 1997, Quick assisted Ruppman in locating two eventual
investors in PST--J. Lewis Partners ("Lewis Partners") and ELK Trust. The deal which the parties
discussed was a loan to PST in exchange for a royalty interest. Quick prepared a proposed royalty
agreement for Lewis Partners, ELK Trust, and himself based on a contract that Ruppman had
previously used and given to him. Lewis Partners and ELK Trust ultimately loaned a total of
$650,000 to PST, and PST granted each a royalty interest in revenues generated by income from
licensed patents, products, and technical information. Quick and Ruppman and PST entered into an
agreement, entitled "Royalty Revenue Agreement" (the "Agreement"), on January 23, 1997.

 The Agreement defines the participants as Quick on the one hand and Ruppman and PST on
the other, and it is signed by Quick and by Ruppman, as president of PST. The Agreement grants
Quick a 3 percent interest in Net Royalty Income Revenue, which is calculated by deducting legal
fees and costs incurred in enforcing PST's patent rights or defending PST against claims for
infringement. Paragraph 1.7 of the Agreement defines "Royalty Income Revenue" as:

 [I]ncome derived from Licensed Products which are covered by one or more claims
of an issued and existing Licensed Patent or which are manufactured by any licensee
through use of a Licensed Process covered by one or more claims of an issued and
existing Licensed Patent paid to PST's Royalty account.


 In the spring of 1997, Ruppman attended a conference known as "Bev Pak." The major
plastics companies and numerous companies from around the world attended. PST, Ball, and others
gave a presentation regarding the cryogenic technology. Following Ruppman's portion of the
presentation, Ball representatives announced that they could not talk about the technology and would
not license it, because it was too premature. The Ball announcement had a significantly negative
impact on PST's business. PST's plans for significant licensing revenue from Ball vanished, and
the relationship between PST and Ball deteriorated. The two companies disputed whether the
technology was commercially viable. Ultimately, an arbitrator concluded that the technology had
not been commercially viable. PST settled the dispute by repurchasing the licensing rights granted
to Ball.

 By May of 1997, PST was cash broke and needed additional investment. At the time, PSMI,
a wholly-owned subsidiary of PST, which was started by Ruppman as a small manufacturing
operation, was manufacturing flower pot carrying trays, high density bottles for fertilizer, and PET
water bottles. This brought in approximately $40,000 to $50,000 a month.

 At Ruppman's request, Quick approached Lewis Partners to solicit additional investment,
but they refused. Thereafter, Quick approached his parents, the Quicks, (1) and his aunt and uncle, the
Bollners, about investing. In exchange for a royalty interest in certain revenue streams of the PST
Defendants, the Quicks and the Bollners agreed to a loan totaling $100,000. Unlike Quick's royalty
agreement, the Bollners' and Quicks' agreements defined the royalty interest to include net
manufacturing of PSMI. (2)

 Around the time the Bollners and the Quicks entered into their agreements, PSMI's
manufacturing revenue dropped, due to the fact that PSMI's handful of customers were experiencing
problems of their own. By the fall of 1997, PST and PSMI were in dire financial condition. PST
was no longer able to make the payments required under the Quicks' and Bollners' notes. This put
a strain on the relationship between Ruppman and Quick.

 In October 1997, PST received $200,000 from a nitrogen supply company known as "BOC." 
BOC was willing to provide money to help PST stay afloat, in the hopes that PST could
commercially develop the cryogenic technology, which used liquid nitrogen. BOC ultimately agreed
to provide PST with $1.5 million for a potential marketing agreement and a share in revenue. 
However, this infusion of cash was made on the condition that the money be repaid as a loan at
BOC's election. BOC tried unsuccessfully to license PST's cryogenic technology and eventually
opted to cancel the agreement and sought repayment from PST. PST and Ruppman were ultimately
unsuccessful in convincing the bottling industry to use the technology.

 By April 1998, PST was again in desperate financial condition and was about to shut down. 
Ruppman met John Albers, a potential investor. After reviewing PST's and PSMI's financials,
Albers, through Appellee Fairfield, began to invest in the companies, keeping them alive. 
Ultimately, Albers, through Fairfield, invested over $20 million in PST and PSMI. The PST
Defendants continued to try to license the cryogenic technology, but without success. Their focus
changed from licensing to manufacturing.

 Around May of 1998, Quick stopped providing any services for the PST Defendants. In
November of 2002, Quick visited Ruppman at the PST/PSMI facility. Quick believed that the
company had expanded and appeared to be doing well. He and his uncle, Daniel Bollner, became
suspicious that the PST Defendants had not been honest with them regarding potential royalty
income. Bollner sent Ruppman a letter inquiring about his interest. Ruppman responded that none
of the royalty provisions had been triggered and that there were no current plans to use the cryogenic
technology.

 Thereafter, Quick filed this lawsuit, asserting claims against PST Defendants in tort, 
contract, and for a declaratory judgment as to the Agreement. The PST Defendants counterclaimed
for usury and sought a declaratory judgment that no sums were owed to Quick. Quick subsequently
brought claims against Fairfield, based on a vicarious liability theory. Fairfield brought a no-evidence motion for summary judgment on all of Quick's claims against it, which the trial court
granted. The PST Defendants moved for partial summary judgment, based, among other things, on
the defense of limitations. The trial court granted the motion as to all contract claims prior to June
1, 2000. Quick has not appealed that order.

 Following a bench trial, the trial court entered a take-nothing judgment against Quick. The
court concluded that the "unambiguous and proper construction of the term 'Net Royalty Income
Revenue' is limited to licensing income PST received on or after January 23, 1997," which is the
date of the Agreement. The court also concluded that the scope of the technology defined in the
Agreement was ambiguous. The court found that the intention of the parties in that respect was that
PST was only obligated to pay a royalty for licensing income received on or after January 23, 1997,
"from the heat-set/barrier blow molding technology process PST was trying to market in January of
1997, which used nitrogen at the blow molding stage in bottle manufacturing, and that process
alone." The court found that PST had received no such income since the date of the Agreement. 
The court also concluded that Quick's claim for breach of contract was barred by failure of
consideration and prior material breach. Finally, the trial court awarded Fairfield attorney's fees,
pursuant to the Uniform Declaratory Judgments Act.

 On appeal, Quick challenges the trial court's construction of the Agreement, the court's
findings and conclusions as to failure of consideration and prior material breach, and the court's
award of attorney's fees to Fairfield. The claims that are relevant to this appeal are Quick's claims
for declaratory judgment, for an accounting of the income derived from the PST Defendants'
products, and breach of contract.

II. DISCUSSION

A. Standard of Review

 Legal and factual sufficiency of the evidence standards of review govern an appeal of a non-jury trial on the merits. IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp., 938 S.W.2d 440, 445 (Tex.
1997). When a party appeals from a non-jury trial, it must complain of specific findings and
conclusions of the trial court. Carrasco v. Stewart, 224 S.W.3d 363, 367 (Tex. App.--El Paso 2006,
no pet.); see also Serrano v. Union Planters Bank, N.A., 162 S.W.3d 576, 580 (Tex. App.--El Paso
2004, pet. denied). A general complaint against the trial court's judgment does not present a
justiciable question. Carrasco, 224 S.W.3d at 367; Serrano, 162 S.W.3d at 580.

 A "no-evidence," or legal-insufficiency, point is a question of law which challenges the legal
sufficiency of the evidence to support a particular fact finding. Serrano, 162 S.W.3d at 579. There
are two separate "no-evidence" claims. Id. When the party with the burden of proof suffers an
unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be
that the fact or issue was established as "a matter of law." Id. When the party without the burden
of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support
the finding." Id. (citing In re Estate of Livingston, 999 S.W.2d 874, 879 (Tex. App.--El Paso 1999,
no pet.)). An appellate court will sustain a legal-sufficiency, or "no-evidence," challenge, if the
record shows: (1) the complete absence of a vital fact, (2) that the court is barred by rules of law or
evidence from giving weight to the only evidence offered to prove a vital fact, (3) that the evidence
offered to prove a vital fact is no more than a scintilla, or (4) that the evidence establishes
conclusively the opposite of the vital fact. Carrasco, 224 S.W.3d at 367 (citing City of Keller v.
Wilson, 168 S.W.3d 802, 810 (Tex. 2005)).

 We review a trial court's conclusions of law de novo. Austin Hardwoods, Inc. v. Vanden
Berghe, 917 S.W.2d 320, 322 (Tex. App.--El Paso 1995, writ denied). Erroneous conclusions of law
are not binding on the appellate court, but, if the controlling findings of fact will support a correct
legal theory, are supported by the evidence, and are sufficient to support the judgment, then the
adoption of erroneous legal conclusions will not mandate reversal. Heritage Resources, Inc. v. Hill,
104 S.W.3d 612, 621 (Tex. App.--El Paso 2003, no pet.).

 Findings of fact made by the trial judge, sitting as the fact finder, enjoy the same status as
findings of a jury. Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991); Heritage
Resources, 104 S.W.3d at 619. Where the party with the burden of proof is challenging the factual
sufficiency of the findings, the appropriate complaint is that the adverse findings are "against the
great weight and preponderance of the evidence." Tate v. Tate, 55 S.W.3d 1, 5 (Tex. App.--El Paso
2000, no pet.). In reviewing a factual sufficiency point, we must consider all of the evidence and
determine whether the adverse finding was so against the great weight and preponderance of the
evidence that it was clearly wrong and unjust. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996). 
We do not pass upon the witnesses' credibility, nor do we substitute our judgment for that of the fact
finder, even if the evidence would clearly support a different result. Maritime Overseas Corp. v.
Ellis, 971 S.W.2d 402, 407 (Tex.), cert. denied, 525 U.S. 1017 (1998).

B. Conclusion of Law Three


 Quick first challenges Conclusion of Law Three, in which the trial court held that the
unambiguous and proper construction of the term "Net Royalty Income Revenue" is limited to
licensing income which PST received on or after January 23, 1997. (3) Quick argues that the trial court
erred in its construction of the Agreement for two reasons. First, the court improperly limited the
Agreement to licensing income received by PST, because the Agreement also provides a royalty for
manufacturing income. Second, Quick contends that the trial court ignored the existence of a
licensing agreement that Ruppman had with PST and PSMI.

 1. Contractual Interpretation

 With regard to PSMI's manufacturing income, Quick points to the language of paragraph 1.7
of the Agreement, quoted above. Quick argues that the phrase "manufactured by any licensee
through use of a Licensed Process" entitles him to a royalty on PSMI's manufacturing income. 
Quick later argues that PSMI is a "licensee," because the term "license" in the Agreement merely
means "to use," and that PSMI has been using a licensed process in manufacturing its products. 
Thus, Quick contends, the Agreement not only provides an interest in licensing fees paid to PST, but
also any income to PST derived from the manufacture of licensed products by PSMI. Quick does
not explain how PSMI's manufacturing income is the same as income to PST, but merely argues that
"[i]ncome was received by PST through PSMI after January 23, 1997."

 To construe a contract, the court should ascertain the objective intent of the parties as
expressed in the instrument. Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). To do this, courts
should examine and consider the entire instrument in an effort to harmonize and give effect to all
provisions, so that none will be rendered meaningless. Id. No single contract provision taken alone
will be given controlling effect; rather, all the provisions must be considered with reference to the
whole instrument. Id. The language in a contract should be given its plain grammatical meaning,
unless to do so would defeat the parties' intent. DeWitt County Elec. Coop. v. Parks, 1 S.W.3d 96,
101 (Tex. 1999).

 Ambiguity is a question of law that must be decided by examining the contract as a whole,
in light of the circumstances present when the contract was entered. Columbia Gas Transmission
Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996). A contract is not ambiguous, if it
can be given a definite or certain meaning as a matter of law. Id. However, if the contract is subject
to two or more reasonable interpretations after applying the pertinent rules of construction, the
contract is ambiguous, which creates a fact issue on the parties' intent. Id. An ambiguity does not
arise simply because the parties advance conflicting interpretations of the contract. Id. For an
ambiguity to exist, both interpretations must be reasonable. Id.

 The "Payments and Accounting" section of the Agreement indicates that it only applies to
licensing income. The Agreement requires royalty payments to be made from an escrow account on
a monthly basis. In the same section, the Agreement provides that "At such time, escrow agent shall
include with such payment a statement of accounting setting forth the amount of Net Royalty Income
Revenue earned and collected from each licensee during the preceding calendar month" (emphasis
added). The accounting and payment section also provides that "PST warrants it is the owner of the
Licensed Technical Information and the Licensed Patents and that the [sic] PST has the right to grant
licenses" and that "PST and Ruppman shall have no liability for any loss, expense of [sic] damage,
arising from any uncollected royalties from any licensee . . . ." (both emphases added). There are
no provisions regarding the payment of a royalty on any other type of income.

 The Agreement's recitals (4) are also revealing:

 WHEREAS, PST filed an application for patent in the United States and other
foreign countries which it intends will cover the heat-set/barrier blow molding
technology and preforms and bottles manufactured using such technology; and is
licensing said technology worldwide, and any other applications of this technology;
and


 WHEREAS, Participant [Quick] has been of assistance to further PST's licensing
efforts and;


 WHEREAS, PST is willing to grant to Participant and Participant desires to obtain
an interest in PST's royalty income from licensing PST's and [sic] technical and
commercial information relating to their heat-set/barrier blow molding technology,
and any other applications of this technology.


 Finally, although the terms "Licensed Patents," "Licensed Technical Information," "Licensed
Products," and "Licensed Process" are defined terms in the Agreement, the use of the adjective
"licensed" in each definition further indicates that the Agreement concerns licensing income. When
considered as a whole, it is apparent that the Agreement provides Quick a royalty interest in licensing
income to be received by PST.

 The circumstances surrounding the execution of the Agreement also support the trial court's
conclusion. At the time that Quick entered into the Agreement, there were very high expectations
regarding the potential for PST's relationship with Ball to generate significant income from
licensing. Indeed, this is why people were willing to invest in PST. The basis for the Ball
Agreements was the licensing of Ruppman's cryogenic technology. Under the terms of the Ball
Agreements, PST and Ball would split income received from licensing the technology. The interest
in licensing income was substantial enough for the ELK Trust and Lewis Partners to invest a total
of $650,000 in PST, in exchange for royalty agreements. Moreover, PSMI had only recently been
formed by Ruppman to manufacture flower trays and water bottles. PSMI did not have the capability
to do substantial manufacturing at the time and was not doing so. Accordingly, we believe that the
trial court's construction of the contract was correct. (5)

 2. Exclusion of Evidence

 Quick also argues that the trial court committed harmful error by refusing to admit into
evidence a superseded pleading of the PST Defendants, in which they admitted that manufacturing
income was subject to the Agreement. At trial, Quick's attorney asked Ruppman whether his
contention was that the Agreement allowed Quick a royalty only if the income came from licensing
of the cryogenic technology. Ruppman responded that this was correct. Counsel for Quick then
questioned Ruppman about the PST Defendants' Original Answer and Counterclaim, which had
been superceded. Counsel for Quick asked Ruppman whether, in their Original Answer and
Counterclaim, the PST Defendants had requested a declaratory judgment, that the court "declare and
define that the cryogenic royalty agreement has no application to any revenue other than as derived
from licensing or manufacture of products using cryogenic technology processes . . . ." Ruppman
confirmed that this was what the superceded pleading stated. The trial court overruled the PST
Defendants' objection to this questioning, but refused to admit the pleading into evidence.

 A trial court's decision on the admissibility of evidence is reviewed under an abuse of
discretion standard. Franco v. Franco, 81 S.W.3d 319, 340 (Tex. App.--El Paso 2002, no pet.). To
successfully challenge a judgment based on the exclusion of evidence, an appellant must show that
the trial court's ruling was in error and that the error was calculated to cause and probably did cause
the rendition of an improper judgment. Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35,
43 (Tex. 1998); City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995); Sears, Roebuck
& Co. v. Abell, 157 S.W.3d 886, 897 (Tex. App.--El Paso 2005, pet. denied). The complaining party
is not required to prove that "but for" the error, a different judgment would necessarily have resulted. 
McCraw v. Maris, 828 S.W.2d 756, 758 (Tex. 1992). However, the complaining party must show
that the error "probably" resulted in an improper judgment. Alvarado, 897 S.W.2d at 753; Abell, 157
S.W.3d at 897. Reversible error usually requires showing that the judgment turns on the particular
evidence excluded or admitted. Texas Dep't of Transp. v. Able, 35 S.W.3d 608, 617 (Tex. 2000);
Alvarado, 897 S.W.2d at 753-54; Abell, 157 S.W.3d at 897. We must review the entire record in
making this determination. Abell, 157 S.W.3d at 897.

 Subject to the rules of evidence, an abandoned pleading is admissible into evidence against
the pleader. Bay Area Healthcare Group, Ltd. v. McShane, 239 S.W.3d 231, 235 (Tex. 2007); Huff
v. Harrell, 941 S.W.2d 230, 239 (Tex. App.--Corpus Christi 1996, writ denied). If a superseded
pleading is that of a party-opponent and is offered against that party, it is not hearsay. Id.; Tex. R.
Evid. 801(e)(2). It is not necessary that the superceded pleading be inconsistent with the party's
position at trial in order to be admissible. Id.

 When Quick's counsel offered the pleading into evidence, the PST Defendants objected on
the basis that a superceded pleading is not admissible for any purpose. The PST Defendants did not
object on any other basis. The trial court sustained this objection and refused to admit the pleading. 
In doing so, the trial court erred. However, the exclusion of this evidence does not constitute
reversible error. Statements contained in superseded pleadings are not conclusive and indisputable
judicial admissions. Sosa v. Central Power & Light, 909 S.W.2d 893, 895 (Tex. 1995). When a
pleading is superseded, it is no longer binding on the pleader, in the sense that he is prevented from
disputing the facts contained within it. Tyra v. Bob Carroll Constr. Co., 618 S.W.2d 853, 856 (Tex.
Civ. App.--El Paso 1981), aff'd, 639 S.W.2d 690 (Tex. 1982). The pleading at issue was therefore
not conclusive, and the PST Defendants were entitled to dispute it. Moreover, counsel for Quick was
permitted to read the relevant portion of the pleading on the record and impeach Ruppman on it. (6)

 3. The Ruppman License

 Quick also argues that the trial court erred by ignoring evidence regarding income from a
licensing agreement among Ruppman, PST, and PSMI, entered into on April 5, 1995, and again on
May 1, 1996, that obligated PST to pay Ruppman and his family $50,000 per month for use of the
cryogenic technology (the "Ruppman License"). Quick argues for the first time on appeal that he
is entitled to a 3 percent royalty, in the amount of $102,000, relating to the Ruppman License. Quick
argues that this amount is equivalent to a 3 percent royalty on all contemplated payments under the
Ruppman License from the limitations bar of June 1, 2000, through February 9, 2006, the date of
judgment. Although the license was mentioned at trial, the issue was not presented in Quick's
damage calculations, no damage amount was presented to the trial court, and no findings of fact or
conclusions of law were filed concerning it. Accordingly, Quick waived this claim. Tex. R. App.
P. 33.1(a). Moreover, even if the claim had been presented, the evidence at trial showed that, on July
1, 1999, (7) Ruppman assigned all of his right, title, and interest in the patents and confidential
information concerning the cryogenic technology to PST. This was a requirement of Albers as part
of his investment in PST. After that time, no royalties were paid to Ruppman.

 Quick argues for the first time in his reply brief that he is entitled to a royalty on the $1.5
million paid to PST by BOC. Although the PST Defendants argued in their response that Quick was
not entitled to a royalty based on the marketing fee, Quick's argument here is not properly before this
Court. The rules of appellate procedure do not permit an appellant to add a new issue in a reply brief
in response to some matter pointed out in the appellee's brief, but not raised in the appellant's
original brief. Howell v. Texas Workers' Comp. Comm'n, 143 S.W.3d 416, 439 (Tex. App.--Austin
2004, pet. denied); see also Armstrong v. Roberts, 211 S.W.3d 867, 873 n.4 (Tex. App.--El Paso
2006, pet. denied) (an issue raised in a reply brief is not properly preserved for appellate review). 
"A party waives its challenges to the findings of fact and conclusions of law if it fails to raise them
in its original appellate brief." Howell, 143 S.W.3d at 439. Accordingly, we do not consider this
argument. (8)

C. Conclusions of Law Five and Six

 Quick next challenges Conclusions of Law Five and Six, arguing that they are unsupported
by either legally or factually sufficient evidence. In Conclusion Five, the court held that the term
"Net Royalty Income Revenue" was limited to income PST received on or after January 23, 1997,
from the licensing of defined technology, the exact scope of which was ambiguously stated in the
Agreement. In Conclusion Six, the court held that "the intention of the parties to the Contract
controls and that intention limit[ed] the scope of the term to licensing income PST received on or
after January 23, 1997 from the heat-set/barrier blow molding technology process . . . ." Quick
argues that the court improperly limited the term "Net Royalty Income Revenue" to income only
"from the licensing of defined technology," because that phrase does not appear in the Agreement. 
Quick further argues that the definitions in the Agreement unambiguously define the technologies
that are covered by the Agreement. However, Quick does not explain which technologies are
unambiguously covered.

 Quick does not challenge Finding of Fact Four, in which the trial court found that "[t]he
intention of the parties to the Contract was for PST to only be obligated to pay Plaintiff a royalty
under the terms of the Contract if PST received licensing income on or after January 23, 1997 from
the heat-set/barrier blow molding technology process PST was trying to market in January of 1997,
which used nitrogen at the blow molding stage in bottle manufacturing, and that process alone."

 A trial court's conclusions of law are reviewed as a legal question, and an appellant may not
challenge a conclusion of law for factual insufficiency. I & JC Corp. v. Helen of Troy L.P., 164
S.W.3d 877, 883 (Tex. App.--El Paso 2005, pet. denied). A reviewing court "may review the trial
court's legal conclusions drawn from the facts to determine their correctness." Id. However, if an
appellant does not challenge the trial court's findings of fact on appeal, the findings normally
become binding upon both the party and the appellate court. Carrasco, 224 S.W.3d at 367;
McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986) (unchallenged findings of fact are
"binding on an appellate court unless the contrary is established as a matter of law, or if there is no
evidence to support the finding"). Finding of Fact Four clearly supports the challenged conclusions. 
The trial court thus did not err in reaching the challenged conclusions.

D. Conclusion of Law Seven

 Quick contends that the trial court's conclusion that the PST Defendants did not breach any
term of any contract with him is "wrong." Conclusion Seven states that "[t]he PST Defendants did
not breach any term of the contract with Plaintiff, and the PST Defendants are entitled to a take
nothing judgment as to Plaintiff's claim for breach of contract." The thrust of Quick's argument is
that the trial court misinterpreted the term "cryogenic" as it is used in the Agreement. Quick
contends that Ruppman improperly testified as an expert, that his opinion as to what "cryogenic"
means could not be relied upon, and that both his testimony and the terms of the Agreement show
that "cryogenic" merely means "nitrogen." Quick argues that he was entitled to a royalty on PSMI's
gross manufacturing income, because Ruppman applied for a patent for the use of nitrogen in the
drying process, and the Agreement covers patent applications relating to the use of nitrogen in the
manufacture of plastics. According to Quick, the PST Defendants breached the contract by not
paying him such a royalty.

 Quick's argument is based on the assumption that the trial court, as the trier of fact,
misinterpreted the extent of the royalty interest contained in the Agreement and that PST had
received income for which it had not paid Quick. Yet Quick does not challenge the trial court's
findings regarding these questions. The trial court found that "[t]he intention of the parties to the
Contract was for PST to only be obligated to pay Plaintiff a royalty under the terms of the Contract
if PST received licensing income on or after January 23, 1997 from the heat-set/barrier blow molding
technology process PST was trying to market in January of 1997, which used nitrogen at the blow
molding stage in bottle manufacturing, and that process alone." The trial court also found that "PST
received no licensing income on or after January 23, 1997 from any source or in relation to any
technology . . . ." As noted above, if an appellant does not challenge the trial court's findings of fact
on appeal, the findings become binding upon both the party and the appellate court. McGalliard,
722 S.W.2d at 696. The unchallenged findings of fact provide a basis for the trial court's conclusion
that the PST Defendants did not breach any agreement with Quick. We overrule this issue.

E. Reformation of the Contract

 Quick argues that the trial court, without the requisite pleadings, impermissibly reformed the
Agreement to limit his royalty interest, by concluding that the Agreement was limited to a royalty
on licensing income and not manufacturing income and by concluding that the parties intended the
scope of the technology covered by the Agreement to be limited to the heat-set/barrier blow molding
process.

 "The underlying objective of reformation is to correct a mutual mistake made in preparing
a written instrument, so that the instrument truly reflects the original agreement of the parties." 
Cherokee Water Co. v. Forderhause, 741 S.W.2d 377, 379 (Tex. 1987) (emphases in original) (citing
Brinker v. Wobaco Trust Ltd., 610 S.W.2d 160, 163 (Tex. Civ. App.--Texarkana 1980, writ ref'd
n.r.e.)). "[R]eformation requires two elements: (1) an original agreement and (2) a mutual mistake,
made after the original agreement, in reducing the original agreement to writing." Id. (emphasis in
original) (citing Sun Oil Co. v. Bennett, 125 Tex. 540, 547, 84 S.W.2d 447, 451 (1935);
Restatement (Second) of Contracts § 155 cmt. a (1979)).

 No party contends that there was a mutual mistake in drafting any of the Agreements, and
the trial court did not, and did not purport to, reform them.

D. Uniform Declaratory Judgments Act

 Both Quick and the PST Defendants sought declarations as to their rights under the
Agreement. "[T]he Uniform Declaratory Judgment[s] Act operates to provide an individual whose
rights and legal relations are at issue in a contractual dispute a vehicle by which he can solicit the
court to resolve questions of construction or validity under the contract." Foust v. Ranger Ins. Co.,
975 S.W.2d 329, 331 (Tex. App.--San Antonio 1998, pet. denied). A declaratory judgment requires
a justiciable controversy as to the rights or status of the parties, and the declaration must actually
resolve the controversy. Brooks v. Northglen Ass'n, 141 S.W.3d 158, 163-64 (Tex. 2004). "In suits
for declaratory relief, a trial court has limited discretion to refuse a declaratory judgment, and may
do so only where judgment would not remove the uncertainty giving rise to the proceedings."
SpawGlass Constr. Corp. v. City of Houston, 974 S.W.2d 876, 878 (Tex. App.--Houston [14th Dist.]
1998, pet. denied).

 The central dispute in this case was whether any royalties were owed under the terms of the
Agreement. Quick requested a declaration as to his right to receive royalty payments and specifically
requested declarations "that Plaintiff is entitled to be paid his proportionate share of Net Royalty
Income Revenue, as that term is defined in the Agreements, i.e., 'income derived from Licensed
Products . . . or which are manufactured by any licensee . . ." and that "the royalty payments apply
to income derived from products using Present and Future Technical Information."

 The trial court held that Quick and the PST Defendants "sought and were entitled to relief
pursuant to the Uniform Declaratory Judgment[s] Act, Tex. Civ. Prac. & Remedies Code, § 37.001,
et[] seq. in order to resolve an actual and real controversy and to settle and afford relief from
uncertainty and insecurity regarding the proper construction of the Contract." Quick requested a
declaration that he was entitled to a royalty on both manufacturing and licensing income, but the trial
court held that the Agreement was limited to licensing income. The trial court did not reform the
Agreement, but merely interpreted and construed it according to its terms as requested. With regard
to the scope of the technology, the trial court, as the fact finder, determined the parties' intent as to
an ambiguous term in the Agreement. This does not constitute reformation. We overrule this issue.

F. Failure of Consideration and Prior Material Breach

 The PST Defendants plead failure of consideration and prior material breach as affirmative
defenses to Quick's breach of contract claim. (9) The trial court found that the consideration provided
by Quick for the Agreement failed, based upon Quick's prior material breach of the Agreement. It
therefore agreed that Quick's breach of contract claim was barred because of failure of consideration
and prior material breach. Quick argues that the finding and the conclusion are based on legally and
factually insufficient evidence. Specifically, Quick argues that he provided consideration by
obtaining investment funding for PST from Lewis Partners and the ELK Trust and, later, from his
parents and the Bollners. Quick also argues that he did not commit a prior material breach, because
there was no evidence that he breached the contract and no evidence that there was a contract for him
to provide services to the PST Defendants. The PST Defendants counter that it was understood by
the parties that part of the consideration for the Agreement was that Quick would continue to provide
accounting services, so that his refusal to do so constituted failure of consideration.

 According to Quick, Ruppman told him in 1995 that he did not have the money to pay him,
but he suggested that Quick work for a percentage of PST's income as an arrangement going
forward. Quick believed that he had an oral agreement with Ruppman to this effect. Under the oral
agreement, Quick was to provide various services, including accounting services. Quick testified
that, in February or March of 1995, he and Ruppman discussed a written agreement, which Quick
drafted. However, no written agreement was executed until the Agreement was signed on January
23, 1997. Ruppman also testified that Quick was paid approximately $27,500. Quick's testimony
indicated that $500 of that amount was for expense reimbursements and the remaining amount
consisted of gratuitous payments. Quick testified that Ruppman informed him that the royalty deal
was still in place, but that Ruppman stated that he wanted to get some money into Quick's hands to
cover overhead. Ruppman testified that the payments were to assist Quick in some areas. Quick
believed that the accounting and consulting services he was rendering to the PST Defendants would
be included in the proposed royalty agreement.

 Ruppman testified that, by the fall of 1997 through April, 1998, when Albers became
involved, Quick's work for the PST Defendants was very minimal. In June of 1998, Ruppman and
Quick discussed repayment of the Bollners' and Quicks' promissory notes. From then until 2003,
Quick and the PST Defendants or their representatives had discussions and negotiations concerning
repayment of the promissory note and the PST Defendants' acquisition of the Agreement and the
Bollners' royalty agreement. There was no evidence that Quick did any work for the PST
Defendants after the June 1998 discussion with Ruppman. Ruppman testified that there was no
contract for Quick to provide accounting services. However, he believed that Quick breached the
Agreement by failing to assist with the activities of the company.

 Failure of consideration occurs when, because of some supervening cause after an agreement
is reached, the promised performance fails. McGraw v. Brown Realty Co., 195 S.W.3d 271, 276
(Tex. App.--Dallas 2006, no pet.); Suttles v. Thomas Bearden Co., 152 S.W.3d 607, 614 (Tex. App.--Houston [1st Dist.] 2004, no pet.). Failure of consideration may result from one party's failure to
perform its obligations under the agreement. McGraw, 195 S.W.3d at 276. Quick argues that, when
a party challenges the adequacy of consideration, a court will not look beyond the face of the
contract, unless it finds unconscionability, bad faith, or fraud. Quick argues that the trial court was
precluded from looking beyond the consideration recited in the Agreement. Quick relies on various
cases dealing with adequacy of consideration, including Parker v. Dodge, 98 S.W.3d 297, 301 (Tex.
App.--Houston [1st Dist.] 2003, no pet.). However, as the court in Parker made clear, there is a
distinction between failure of consideration and adequacy of consideration, and the presumption for
which Quick argues applies when the issue of adequacy of consideration is raised. Id. at 301. This
presumption does not apply to the issue of failure of consideration.

 "It is a fundamental principle of contract law that when one party to a contract commits a
material breach of that contract, the other party is discharged or excused from further performance."
Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). "In
determining the materiality of a breach, courts will consider, among other things, the extent to which
the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from
full performance." Hernandez v. Gulf Group Lloyds, 875 S.W.2d 691, 693 (Tex. 1994); Tri-Star
Petroleum Co. v. Tipperary Corp., 107 S.W.3d 607, 622 (Tex. App.--El Paso 2003, pet. denied). 
Quick argues that there was no evidence offered that he breached any agreement. We conclude that
there was some evidence for the trial court to find that Quick promised to provide continued services
to the PST Defendants in exchange for his royalty interest and that Quick breached that promise
because he stopped doing any work for the PST Defendants. We overrule this issue.

G. Fairfield's Attorney's Fees


 Quick contends that the trial court erred in awarding attorney's fees to Fairfield pursuant to
the Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001 et seq. 
Quick does not challenge the trial court's determination that the fees were reasonable and necessary
or that they were equitable and just, but rather Fairfield's right to recover under the statute. The
availability of attorney's fees under a particular statute is a question of law, which is reviewed de
novo. Time Out Grocery v. Vanguard Group, Inc., 187 S.W.3d 41, 42 (Tex. App.--Dallas 2005, no
pet.).

 Quick makes two arguments. First, he asserts that he did not bring a declaratory judgment
claim against Fairfield. Quick claims that the language of his Third Amended Petition (the
"Petition") (10) shows that Fairfield was not sued for a declaratory judgment. In the Petition, however,
Quick broadly requests a declaratory judgment. The request is not limited to any particular
defendant, nor did Quick limit to any defendant(s) his request for attorney's fees under section
37.004 of the Texas Civil Practice and Remedies Code. Quick also asserted a breach of contract
claim against all Defendants.

 Quick was specific with regard to other claims. For example, in his breach of fiduciary duty
claim and claim for accounting, Quick specified that those claims were (only) against PST, PSMI,
and Ruppman. Conversely, he asserted fraud, negligent misrepresentation, tortious interference, and
conspiracy claims against "Defendants, including Fairfield." Quick sought to recover under an aider
and abettor liability theory against Fairfield only.

 With regard to the declaratory judgment action, however, the Petition's prayer requested that
he "recover from Defendants, jointly and severally . . . [a] declaration from the Court that Plaintiff
is entitled to his proportionate percentage of all income derived from the use of Present and Future
Technology . . . ." Considering that the Petition is specific as to the parties sued for most of the
claims, but open-ended with regard to the declaratory judgment claim, the language indicates that
Fairfield was among the defendants sued for a declaratory judgment. See Winters v. Chubb & Son,
Inc., 132 S.W.3d 568, 580 (Tex. App.--Houston [14th Dist.] 2004, no pet.) (discrimination claim was
brought against both employer and supervisor, where the term "defendants" was used in alleging that
claim, whereas a fraud claim was specific to supervisor).

 Both Fairfield and the PST Defendants brought summary judgment motions against Quick. 
Quick points to his response to the PST Defendants' motion for summary judgment, in which Quick
asserted that his declaratory judgment claim was proper, because "Defendants themselves have
raised ambiguity of the contractual arrangements both as an affirmative defense and as a
counterclaim." Quick contends that Fairfield did not raise ambiguity as an affirmative defense or
counterclaim and that this shows that Fairfield was not sued for a declaration. However, the
response relied upon by Quick was only addressed to the PST Defendants' motion for summary
judgment, not that of Fairfield, and it defines the use of the term "Defendants" within the response
as referring to PST, PSMI, and Ruppman. (11) Accordingly, Quick's argument in this regard is without
merit.

 Quick's second argument is that Fairfield was not entitled to recover attorney's fees, because
Fairfield's counterclaim for declaratory judgment merely sought to recover attorney's fees. We agree
with Quick that, since Fairfield's counterclaim sought merely attorney's fees, it is not entitled to
attorney's fees under its own counterclaim. See Fowler v. Resolution Trust Corp., 855 S.W.2d 31,
37 (Tex. App.--El Paso 1993, no writ) (attorney's fees not available for a declaratory judgment claim
that seeks the resolution of disputes already before the court). However, Fairfield's claim is based
on Quick's having brought an unsuccessful declaratory judgment action against it. Under the Act,
"the court may award costs and reasonable and necessary attorney's fees as are equitable and just." 
Tex. Civ. Prac. & Rem. Code Ann. § 37.009. An award of attorney's fees is not limited to the
plaintiff or the party seeking declaratory relief. Hartford Cas. Ins. Co. v. Budget Rent-A-Car Sys.,
Inc., 796 S.W.2d 763, 771 (Tex. App.--Dallas 1990, writ denied). Moreover, because Quick had
already invoked the Act, Fairfield was entitled to assert a claim for declaratory relief and attorney's
fees. First City Nat'l Bank v. Concord Oil Co., 808 S.W.2d 133, 138 (Tex. App.--El Paso 1991, no
writ). Accordingly, Fairfield was entitled to recover its attorney's fees under the Act. We overrule
this issue.

III. CONCLUSION


 We affirm the trial court's judgment that Quick and the PST Defendants take nothing on their
respective claims for monetary relief, and that the Agreement is limited and applies only to income
derived from the licensing of the heat-set/barrier blow molding technology process that PST was
trying to market in January of 1997, which used nitrogen at the blow-molding stage of bottle
manufacturing, and that process alone. We affirm the trial court's judgment that Quick's claim for
breach of contract was barred based on the defense of failure of consideration and prior material
breach. We also affirm the trial court's judgment awarding attorney's fees and costs to Fairfield. (12)



 KENNETH R. CARR, Justice

June 27, 2008


Before Chew, C.J., McClure, and Carr, JJ.

1. Hereinafter, "Quick," in the singular, shall refer to Appellant, David Quick; "the Quicks," in the plural, shall
refer to his parents, George and Norma Quick.
2. The Bollners and the Quicks brought similar claims against Appellees in a lawsuit styled Daniel J. Bollner
et ux. Dorothy L. Bollner; George J. Quick et ux. Norma A. Quick v. Plastics Solutions of Texas, Inc., a Texas
Corporation; Plastics Solutions Molding, Inc., a Texas Corporation; and Kurt H. Ruppmann, Sr., Individually and
Fairfield Enterprises, Inc., Cause No. 380-1399-04, in the 380th District Court of Collin County, Texas, which is the
subject of a companion appeal. The Bollners' and Quicks' claims and those of Quick were tried together.
3. In Finding of Fact Three, the trial court found that "PST received no licensing income on or after January 23,
1997 from any source or in relation to any technology." Quick does not challenge this finding.
4. Although recitals to a contract generally will not control a contract's operative clauses, unless those clauses
are ambiguous, the recitals may be looked to in determining the proper construction of the contract and the parties' intent. 
Gardner v. Smith, 168 S.W.2d 278, 280 (Tex. Civ. App.--Beaumont 1942, no writ); see also BCH Dev. Corp. v. Bee
Creek Hills Neighborhood Ass'n, 1996 WL 727385 (Tex. App.--Austin Dec. 19, 1996, writ denied) (not designated for
publication) (stating that a recital may, in some circumstances, be looked to in determining the proper construction of
a contract and the parties' intent).
5. Although Quick's argument is not entirely clear, to the extent that he contends that PSMI was a licensee of
PST and that PST received licensing income from PSMI, this argument fails. The trial court found that PST received
no licensing income from the date of the Agreement "from any source or in relation to any technology . . . ." Quick does
not challenge the sufficiency of this finding on appeal. As such, we do not address Quick's apparent argument that PST
received licensing income from PSMI.
6. The trial judge was thus aware of the prior pleading and Appellant's contention regarding it at the time he
prepared his findings of fact and conclusions of law. Therefore, even though we have held that the judge erred in
refusing to receive the Original Answer into evidence, we nevertheless conclude that it is "improbable" that his failure
to do so resulted in an improper judgment.
7. This transfer occurred outside the statute of limitations period.
8. Quick also challenges Conclusion of Law Four, in which the trial court concluded "[s]hould the contract be
determined by an appellate court to be ambiguous in regard to whether the Contract term 'Net Royalty Income Revenue'
includes anything other than licensing income PST received on or after January 23 ,1997, then the intention of the parties
to the Contract controls and that intention limits the scope of that term to licensing income PST received on or after
January 23, 1997." Because we have overruled Quick's issue concerning Conclusion of Law Three, we do not address
his argument concerning Conclusion of Law Four.
9. Although the evidence arguably raises the further question of whether the Agreement was unenforceable for
lack of consideration, the PST Defendants did not challenge the Agreement on this ground.
10. This is the pleading upon which Quick went to trial.
11. Quick's assertion that Fairfield did not assert ambiguity as an affirmative defense or counterclaim is
somewhat questionable. In its Amended Answer and Counterclaim, Fairfield plead that it "asserts and incorporates
herein by reference any and all affirmative defenses alleged by Plastic Solutions of Texas, Inc., Plastic Solutions
Molding, Inc. and Kurt Ruppman, Sr. in their answers on file in this case."
12. The trial court determined that Fairfield was entitled to $77,000 in attorney's fees and $5,271 in trial court
costs (plus post-judgment interest). While Quick has challenged Fairfield's right to recover any amount in attorney's
fees, he has not challenged the reasonableness or necessity of the amount awarded. Payment of any amount of this award
by the Bollners and/or the Quicks shall constitute a credit toward satisfying the award against Quick in this case.